**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Crim. No. 06-81 (RMU)** |
| ) | |
| **RENEE LANGLEY,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND MOTION FOR
DOWNWARD DEPARTURE AND MEMORANDUM IN SUPPORT THEREOF**

The defendant, Renee Langley, through undersigned counsel, hereby respectfully submits this memorandum in aid of sentencing and departure motion under U.S.S.G. §§ 5K2.0 and 5H1.6. Under the specific facts and circumstances of this case, including Ms. Langley's extraordinary family circumstances, and based upon the Guidelines and a consideration of the sentencing factors under 18 U.S.C. § 3553(a), the defense respectfully submits that the appropriate sentence in this case is a period of probation, with a condition of home detention.

**BACKGROUND**

**A.      Procedural History and Offense Conduct.**

On April 18, 2006, Ms. Langley plead to a one count Information charging her with wire fraud. The offense occurred during Ms. Langley's employment as an administrative aid with the Treasury Management Division ("TMD") at George Washington University ("GWU") between June 2003 and October 2004. The offense related to Ms. Langley's unauthorized use of GWU funds for personal purchases and expenses. All told, defendant's unauthorized expenditures added up to $75,748.43, which is the loss amount found in the Presentence Report. Prior to the

time of her plea, however, $17,337 of the loss had already been repaid to GWU.

On December 22, 2004, FBI agents visited Ms. Langley at her home in Chesapeake, Maryland, at which time she provided the agents with a full confession concerning her illegal conduct. She immediately told the Agents that her conduct had been "stupid" and that she was sorry for what she had done.

**B.     Ms. Langley's Employment.**

Ms. Langley is employed full-time as administrative coordinator with MedStar Research Institute, which is part of the Washington Hospital Center in Washington, D.C. See PSR ¶ 47. She was hired at MedStar on April 8, 2005 and makes approximately $1100 every two weeks. Id. Importantly, Ms. Langley also receives benefits, including medical insurance for herself and her children, including her ill daughter Emily, see infra. Were Ms. Langley to be incarcerated, she would almost certainly lose her job. See PSR ¶ 47 (noting that Ms. Langley's employer is unaware of the instant offense).

**C.     Ms. Langley's Extraordinary Family Circumstances.**

Ms. Langley's extraordinary family circumstances are set forth at paragraphs 36-37 of the PSR. Ms. Langley has four children, all of whom live with her: Zachary Duvall (age 18); Amber Wolford (age 14); Emily Wolford (age 11); and Kristen Langley (age 7). Unfortunately, none of the fathers are potential caretakers for the children. See PSR, ¶¶ 36-37. Bill Wiley, the father of Zachary, "does not pay child support and is not involved in Zachary's life." Id., ¶ 36. Ken Wolford, the father of Amber and Emily, pays child support on an irregular basis, and visits with one of this daughters, Emily, on some weekends. Id. Kenneth Langley, Kristen's father, is court ordered to pay $600 in child support and spends every other weekend with his daughter. Id.

2

In addition to the heavy burden that rests on any single mother to four children, Ms. Langley's family situation is seriously complicated due to the medical condition of her 11 year old daughter, Emily.  As verified by the Probation Office through, *inter alia*, Emily's medical records, Emily suffers from a number of serious medical conditions.  See PSR, ¶ 37.  She is "in need  of constant medical attention and is very susceptible to infections."  Id. (quotations omitted).  Ms. Langley dedicates almost all of her free time to taking care of her ill daughter.  See id.  Unfortunately, there is no one besides Ms. Langley who will be there to ensure that Emily receives the medical attention and care she needs.

In addition to the significant amount of time that Ms. Langley dedicates to Emily's medical conditions, Emily and Ms. Langley are dependent on Ms. Langley's health insurance from MedStar in order to pay for Emily's medical care.  Emily's father, Ken Wolford, does not have medical insurance and apparently does not have the means or the inclination to pay for it.  See PSR, ¶ 39.  Mr. Wolford is self employed and makes a limited income of $20,000 a year; when he quit his previous job, he dropped daughters Amber and Emily from his health insurance.  See id. ("Mr. Wolford quit his job and became self-employed, 'knowing that Emily had health problems, he then dropped the kids off his health insurance and only insured himself'").

Should Ms. Langley receive a sentence of incarceration, she will have no alternative child care arrangements.  See PSR, ¶¶ 36-39.  The fathers of the children are only minimally involved in the children's care and cannot be depended upon to care for them in Ms. Langley's absence.  See id.  Mr. Duvall, Zachary's father, cannot take care of the children because of a fixed income and his own health problems.  See PSR, ¶ 39.  Ms. Langley's mother, Patricia Duvall, is in the early stages of Parkinson's disease.  See id.  As apparent from the PSR, Mr. Wolford is not

3

willing or suitable for a care giving role. See id., 37, 39.

Furthermore, there is no substitute for Ms. Langley's health insurance benefits for Ms. Langley's daughter, Emily, who desperately needs medical care in order to live. See id., ¶ 37. Should Ms. Langley receive a sentence of imprisonment, she would very likely lose her job. along with the medical insurance benefit that comes with it. See id., ¶ 47. If Ms. Langley is incarcerated for even only several months, there is no guarantee she would soon gain comparable re-employment upon her release. Therefore, the effects of her incarceration would be devastating to the children for whom she is responsible by causing the family to lose their primary source of income–and their medical insurance–for an indeterminate period of time.

**D.      The Presentence Report.**

The PSR correctly sets forth the following calculation of Ms. Langley's Guidelines, based on the Guidelines Manual (2005) promulgated by the United States Sentencing Guidelines Commission. Ms. Langley has a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a); an 8-level increase in the base offense level corresponding to the loss amount of $75,748.43, pursuant to U.S.S.G. § 2B1.1(b)(1)(E); and a 2-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a). The total offense level, after adjustments, is 13, and Ms. Langley has no criminal convictions so her criminal history category is I. Accordingly, the PSR is correct that the pre-departure guidelines range is 12 to 18 months in Zone D.

It should be noted that the loss amount in Ms. Langley's case is just $5,000 above the $70,000 amount that marks the difference between 2 additional offense level points and a Zone C and Zone D sentence. See U.S.S.G. § 2B1.1(b)(1)(E). And, as noted, over $17,000 of that loss amount was returned to GWU prior to the time of the plea in this matter.

The PSR also notes, correctly, that the Probation Office has identified factors that support a departure under the Guidelines.  The PSR states:

> As outlined in Part C., Personal and Family, the defendant has three young children who are financially dependent on her.  Her daughter Emily has significant health concerns which the probation office has verified.  The Court may wish to take into consideration her children's dependence on the defendant for their care and support.  If the Court finds the condition is extraordinary under USSG § 5H1.6, comment.(n(1))B)(i) and (iii), Family Ties and Responsibilities, the Court may depart from the applicable range.

PSR, ¶ 72.

With respect to a downward adjustment from the Guidelines pursuant to Booker, the PSR also notes that:

> Ms. Langley has no criminal convictions.  She graduated high school, completed some college courses, has a stable residence and no apparent need for correctional treatment.  The Court may wish to consider these factors as it relates to imposing a sentence to meet the purposes of sentencing that is sufficient but not greater than necessary.  18 U.S.C. § 3553(a)(1).

Id., ¶ 73.

## DISCUSSION

## I.    THE POST-BOOKER SENTENCING FRAMEWORK.

The Court in Booker held that judges are required to "take account of the Guidelines together with other sentencing factors," and to "consider" the guidelines along with all the other required factors.  Id. at 259 (emphasis added).  But there is no requirement that a sentence be within the guidelines range, and a number of other statutory factors, which are mandatory, must be followed by the court, because section 3553(a) remains in effect and sets forth numerous factors that guide sentencing.  Id. at 261.

Thus, courts are now required to impose a sentence "sufficient, but not greater than

necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).

(Emphasis added). These purposes include the necessity for the sentence:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Subsections (A) through (D) of § 3553(a)(2) thus highlight the primary purposes of sentencing. See also § 3551 (defendant "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) . . ."). In determining a sentence consistent with these goals, the court must consider a number of other factors as well- - see § 3553(a)(1) - (7) - - including "the nature and circumstances of the offense and the history and characteristics of the defendant," the sentencing guidelines and policy statements issued by the Sentencing Commission, and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In addition, "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense, which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Following Booker, the D.C. Circuit has explained that § 3553(a) "remains in effect, and sets forth numerous factors that guide sentencing," and that because the guidelines are now

advisory, they are now "one among a number of factors to be weighed by the District Court in sentencing." United States v. Price, 409F.3d 436, 442-3 (D.C. Cir. 2005). The court of appeals also recently decided United States v. Ayers, 428 F.2d 312 (D.C. Cir. 2005), a case in which the district court had, before Booker, imposed a guidelines sentence and an alternative sentence that were identical. The Ayers court remanded for resentencing because it was "in doubt as to whether the court considered the other sentencing factors in § 3553(a) together with the Guidelines in formulating its non-guidelines sentence." Id. at 315. The court stated that defendant's request to present mitigating evidence reflecting factors not included in the guideline-oriented presentence report was appropriate because "mitigating evidence would have been relevant, of course, to the court's analysis under § 3553(a)." Id. The court also adopted, id. at 314, the view of the Second Circuit in United States v. Lake, 419 F.3d 111, 114 (2d Cir. 2005), that "without the mandatory duty to apply the guidelines, consideration of the other section 3553(a) factors 'acquires new significance.' " (Quoting United States v. Crosby, 369 F..3d 103, 111 (2d Cir. 2005)).

More recently, the court of appeals decided United States v. Gomez, 431 F.3d 818, 822 (D.C. Cir. 2005), where the district court had treated the guidelines "as mandatory." The defendant had requested downward departures on various grounds, but the district court believed that the factors did not warrant a departure. Nevertheless, the court remanded for sentencing because, "if Booker's rendering the Guidelines discretionary means anything, it must give a district judge greater latitude on these issued than did Koon v. United States, 518 U.S. 81 (1996)." Gomez, 431 F.2d at 825. The court further noted that a denial of a departure was "a quite different inquiry" from whether a district court "if subject to the guidelines only on a

discretionary basis, . . . would be reasonably likely to give a lower sentence." Id. at 826.  This is because, in addition to the guidelines, "the district court must consider the criteria set forth in section 3553(a)."  Price, 409 F.3d at 446 (Henderson, J., concurring) (emphasis in original).

In United States v. Brown, this circuit recognized that pre-Booker calculation can no longer be sustained on appeal when the trial court felt restricted from considering factors which the Guidelines would discard.  See United States v. Brown, 449 F.3d 154, 159 (D.C. Cir. 2006).  The Brown court recognized that factors such as death and illness in the family, psychiatric treatment, and family difficulties may all weigh on the trail court's decision to depart from the sentencing regime.  Id.  The trial court in Brown committed reversible error when it expressed inability to consider such factors.  Id.  Despite the recognition that the trial judge may have reached the exact same sentencing decision, failure, after Booker, to consider a wider range of mitigating factors necessitated remand for resentencing.  Id. at 160.

A number of other courts of appeals have recognized that the guidelines are not always consistent with other goals of sentencing and that those goals sometimes conflict with each other.  A prime example is United States v. Serrata, 425 F.3d 886, 913-915 (10th Cir. 2005), where the district court had erred in granting departures under the guidelines for various factors.  The court of appeals, held, however, that these same factors were relevant to the district court's consideration, under § 3553(a), of whether a sentence below the advisory guidelines range was appropriate.  Id. at 918.  The court noted that there "appears to be tension among the statutes and the guidelines . . . but, in the wake of Booker, the incongruity diminishes as sentencing judges are encouraged to exercise their discretion." Id. at 918-9.

Likewise, in United States v. Scott, 405 F.3d 615, 617 (7th Cir. 2005), the court of

appeals stated that "with the guidelines advisory the judge can take into account mitigating

factors that the guidelines ignored."  "Anything but a loose comparison to pre-<u>Booker</u> departure

cases would vitiate the post-<u>Booker</u> discretion that sentencing courts enjoy."  <u>United States v.</u>

<u>Castro-Juarez</u>, 425 F.3d 430, 436 (7th Cir. 2005).  After <u>Booker</u>, factors that were discouraged as

departures under the guidelines "might be afforded more weight in a particular case" under the

statute.  <u>United States v. Lata</u>, 415 F.3d 107, 131 (1st Cir. 2005).

　　　　In <u>United States v. Nickl</u>, 427 F.3d 1286, 1303 (10th Cir. 2005), the court remanded for

resentencing because although the district court had "concluded mandatory application of the

sentencing guidelines prohibited it from granting a downward departure," the district court might

not have imposed "the same sentence if it viewed the guidelines as merely advisory."  Factors

"which were not available for consideration under the mandatory Guidelines regime,"

 may now be considered in imposing sentence.  <u>United States v. Antonakopoulos</u>, 399 F.3d 68,

81 (1st Cir. 2005) However,

> It is worth noting that a district court's job is not to impose a "reasonable"
> sentence.  Rather, a district court's mandate is to impose "a sentence sufficient,
> but not greater than necessary, to comply with the purposes" of section
> 3553(a)(2).  Reasonableness is the *appellate* standard of review in judging
> whether a district court has accomplished its task.

<u>United States v. Foreman</u>, 436 F.3d 638, 644 n.1 (6th Cir. 2006) (emphasis in original).

## II.     THE COURT SHOULD DEPART THREE LEVELS BASED ON MS. LANGLEY'S EXCEPTIONAL FAMILY CIRCUMSTANCES.[1]

Because Ms. Langley's pre-departure guideline range places her in Zone D, a guidelines sentence–even at the low end–would be disastrous for Ms. Langley and, more to the point, for her children, including her 11-year old daughter, Emily.  The Court, therefore, should depart 3 levels from the base offense level 13 based on Ms. Langley's extraordinary family circumstances, and sentence her to probation with a component of home detention.

Departures for extraordinary family circumstances are well recognized.  The analysis begins with U.S.S.G. § 5K2.0, which provides:

> [u]nder 18 U.S.C. 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."  . . .

U.S.S.G. § 5K2.0.  Under U.S.S.G. § 5H1.6, a Policy Statement, family ties and responsibilities are "not ordinarily relevant in determining whether a departure may be warranted."  The Guidelines make clear, however, that a departure may be justified based on a series of factors, including the "loss of [a family's] caretaking or financial support."  Id., Application Note 1(B).

---

[1]     Defendant notes that other Circuits have held that the departure system of the Guidelines is anachronistic in light of Booker and the transformation of the Guidelines from mandatory to advisory.  See United States v. Mohamed, No. 05-50253 (9th Cir. Aug. 11, 2006) (holding that departures have been "essentially replaced by the requirement that judges impose a 'reasonable' sentence"); United States v. Arnaout, 431 F.3d 994, 1003 (7th Cir. 2005) ("the concept of 'departures' has been rendered obsolete in the post-Booker world).  By contrast, other circuits have held that district courts must still examine guideline departures.  See, e.g., United States v. Selioutsky, 409 F.3d 114, 118-19 (2d Cir. 2005).  Defense counsel is unaware of any decision from this Circuit directly addressing the issue.

The Note lists a number of criteria for the Court to examine in determining whether a departure is appropriate:

(i)      The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct and specific loss of essential caretaking, or essential financial support, to te defendant's family;

(ii)     The loss of caretaking or financial support substantially exceeds the hard ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration;

(iii)    The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family;

(iv)     The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, Application Note.

This Circuit has repeatedly held that extraordinary family circumstances are permissible grounds for departure.  See, e.g., United States v. Dyce, 91 F.3d 1462, 1466 (D.C. Cir. 1996) (holding that although family ties and responsibilities of defendant are generally inappropriate considerations, they may provide  appropriate grounds for sentencing departures when family circumstances are "extraordinary").[2]  As explained in Dyce, extraordinary family circumstances

---

[2]      The Court in Dyce vacated a district court's decision to depart based on extraordinary circumstances concluding that the scenario present did not rise to the level of "extraordinary."  91 F.3d at 1467.  In Dyce, the defendant "was living with the father of her children, her parents and sister, who were employed."  Id. at 1467.  There was no evidence that the defendant had been "gainfully employed during the six years preceding her arrest," nor was there evidence that she "currently shoulder[ed] the financial burden of raising her children."  Id. The evidence showed that her children would be taken care of by her family, during any incarceration period.  Id.  The Court stated that "the only factor that even arguably removes this case from the relevant heartland of cases is [the defendant's] breast-feeding of her youngest child."  Id.

11

are present where an individual who is the primary source of income and or care might be removed from the household for a period of time, due to incarceration, thereby causing family hardship. See Dyce, 91 F.2d at 1467 (citing United States v. Gaskill, 991 F.2d 82 (3d Cir. 1993) (defendant was the sole provider for his wife, who had been manic-depressive for 30 years and was unable to leave the house or take care of herself)); United States v. Pena, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (defendant, a single mother, was steadily employed and was the source of support for an infant, a 16-year-old daughter, and the latter's infant).[3]

Ms. Langley's extraordinary family circumstances meet--and well surpass--the standard for a family circumstances departure set down in Dyce and other cases. Ms. Langley, quite unlike the defendant in Dyce, provides the core backbone of her family living structure. She is the only caregiver in the lives of her four children. See United States v. Alba, 933 F.2d 1117 (2d Cir. 1991) (affirming departure and noting the special situation of defendant's close-knit family whose stability depended on the defendant's continued presence); see also United States v. Galante, 111 F.3d 1029,1036 (2d Cir. 1997) (the economic condition and security of a defendant's family are proper considerations in deciding whether to depart, and departure was warranted where defendant was the primary earner of the family).

Moreover, Ms Langley provides the primary caretaking and financial support for her seriously ill daughter, Emily. Without Ms. Langley, Emily will have neither the care nor the

---

[3]     In Dyce, the court pointed out that the defendant's circumstances were "demonstrably better than those of many defendants who have been denied departures for extraordinary family responsibilities." 91 F.3d at 1467-68 (citations omitted). Here, as explained above, Ms. Langley is the atypical single mother: she works full time to support her four children, one of whom suffers from very serious medical problems, has no alternative child care options, and is the only source of health insurance for her family.

financial assistance (in the form of medical insurance) that she requires.  In sum, Ms. Langley

faces "more than the responsibilities of an ordinary parent, more even than those of an ordinary

single parent."  United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992) (affirming departure

for extraordinary family circumstances where defendant solely responsible for upbringing of her

three young children and of child of institutionalized daughter).  The Court should accordingly

depart three levels based on Ms. Langley's extraordinary family circumstances.

**C.     IN THE ABSENCE OF A DEPARTURE THE COURT SHOULD SENTENCE MS.
LANGLEY TO PROBATION UNDER BOOKER AND 18 U.S.C. § 3553(A).**

For the same reasons the Court should depart downward from the guideline range of 12-

18 months and sentence Ms. Langley to probation (with home detention), the Court should

sentence Ms. Langley to the identical sentence under Booker.  Given Ms. Langley's "history and

characteristics," 18 U.S.C. § 3553(a)(1), an extended period of probation with home detention is

certainly a reasonable sentence, and comports with this Court's mandate to sentence Ms. Langley

to a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of

sentencing.

13

## **CONCLUSION**

Wherefore, for the foregoing reasons and any others that may appear just and proper, Ms. Langley respectfully requests that the Court grant her a downward departure of 3 levels from the otherwise applicable guideline range, and sentence her to a period of probation, which may include home confinement.  Alternatively, Ms. Langley requests that the Court sentence her to the same sentence under Booker.

Respectfully submitted,


A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500, ex. 134

Counsel for Renee Langley

14