UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal No. 06-81 (RMU) |
| | : | |
| | : | |
| **RENEE A. LANGLEY,** | : | |
| | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND
OPPOSITION TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, submits its Memorandum in Aid of Sentencing and opposition to the defendant's Motion for Downward Departure. For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the Pre Sentence Report ("PSR") and order her to make full restitution.

I.  **BACKGROUND**

On April 18, 2006, the defendant, Renee A. Langley pled guilty to a one-count information charging her with Wire Fraud, in connection with her theft of $75,748.43 from her employer, George Washington University ("GWU"). During her plea colloquy the defendant admitted that between June 2003 and October 2004, she was employed by GWU as an executive aid in the Treasury Management Division ("TMD"), located in the District of Columbia. The TMD handled checks, vendor payments, wire transfers, and banking relationships for accounts not directly related to student enrollment. The defendant's job duties included dealing with contributions from endowments and wills and trusts as well as providing administrative support to the Director of Cash Management and the Associate Vice President of Finance. In her

employment capacity, the defendant was authorized to initiate preparation of cashier's checks issued by Riggs Bank from GWU's working capital account to approved vendors as payment or prepayment for services or for legitimate expenses. The defendant also was authorized to issue payment requests to the accounts payable department for prize/award checks to be issued to students. The defendant had access to and was authorized to check funds available in endowment accounts prior to sending requests to the accounts payable department. GWU also issued the defendant a credit card (called a purchase card or "P card") for work-related expenses. As was the case with all GWU employees, the defendant was required to obtain authorization from her supervisor for P card purchases.

While employed at GWU, the defendant developed a scheme whereby she embezzled $75,748.43 in funds from GWU using three general methods. First, she caused cashier's checks to be issued on GWU's Riggs Bank working capital account, made payable to businesses or family members or other individuals, which she then endorsed and used for her own purposes. Second, she used her GWU-issued "P card" to pay for $5,895.3 in personal items and services not related to her work and not authorized by her supervisors as required. Third, she obtained a Verizon cellular phone account in the name of a co-worker, and without the co-worker's authorization obtained a second phone line for herself associated with the account. Using this account, the defendant accrued $981.44 in cell phone charges.

On December 23, 2003, while in her office in the District of Columbia, the defendant used her P-card to purchase an electronic airline ticket for $749.00 from Alaska Airlines for round-trip airfare between Washington, D.C.- Dulles to Seattle, Washington on behalf of her son. In making this purchase, the defendant transmitted and caused to be transmitted by means

2

of wire communication in interstate commerce, e-mail communications to Alaska Airlines, a company located in Seattle, Washington.  The defendant also purchased airline tickets for herself and three friends from Continental Airlines for another trip, as well as a Dell laptop computer, a Personal Digital Assistant (P.D.A.), course-work at the University of Phoenix, use of a rental car, Verizon phone service and other personal items.

  Also as part of the defendant's scheme to embezzle money from GWU, she created written memoranda purportedly authored by GWU employees requesting the issuance of cashier's checks from Riggs Bank drawn on GWU's bank account.  The defendant then transmitted these requests to a Riggs Bank branch office in the District of Columbia, causing the bank to issue the cashier's checks.  Once issued, the defendant would pick-up the cashier's checks or have them delivered to her at GWU.

  On February 6, 2004, the defendant fraudulently obtained a cashier's check issued by Riggs Bank, drawn on a GWU account, made payable to "P.F. Ford," which she used to purchase a 2004 Ford Expedition from Prince Frederick Ford in Maryland.  The defendant embezzled the funds used to pay for the Expedition by creating a false payment request memorandum addressed to herself from "G.N.," an employee of GWU's Office of Public Safety & Emergency Management.  This memorandum directed that she obtain a cashier's check made payable to "P. F. Ford" in the amount of $37,493.69.  The defendant sent the request for the cashier's check to a Riggs Bank branch office in the District of Columbia.  Upon receiving the request, Riggs Bank issued check in the amount of $37,493.69, made payable to "P.F. Ford," drawn on GWU's account.  The defendant later gave the check to Prince Frederick Ford as payment in full for the Expedition.

The defendant documented the Expedition expenditure in GWU's budget accounting as a charge under another account and posted the transaction to GWU's Public Safety Department. She then created false journal entries in GWU's general ledger clearing account to disguise the transaction. Because of off-setting journal entries, the fraud was not readily detected.

During the course of her employment with GWU, the defendant caused several other cashier's checks to be issued by Riggs Banks drawn on GWU's account, by creating false requests for the authorization of these checks and forging her supervisors' approval signatures. One of these checks was made payable to a plastic surgeon's office and the others were made payable to the defendant's children or others without their knowledge, and endorsed by the defendant into her M & T Bank account. The total amount of money the defendant received from creating and cashing these checks was $31,378.00.

FBI Agents interviewed the defendant on December 23, 2004 at her residence in Maryland. As soon as the agents identified their purpose for speaking with her, the defendant stated that what she did was "stupid" and that she was sorry. The defendant claimed that she was desperate for money and experiencing financial difficulties. During the interview, the defendant admitted that on or between June 2, 2003 and August 20, 2004, she used her GWU P-card to purchase goods and services for her own benefit that had nothing to do with her job responsibilities, including an Alaskan Airline ticket for her son's travel to Seattle; four Continental airline tickets for a trip from Baltimore, MD to Seattle, WA for herself and three friends; a vehicle rental, a laptop; college tuition payments; and other miscellaneous items. The defendant also admitted that she created the fraudulent memorandum from GWU employee G.N. requesting that a cashier's check be issued to "P.F. Ford, Inc" and that she sent that request to

Riggs Bank, causing the bank to issue a cashiers check for $37,493.69 from a GWU account. The defendant gave this check to Prince Frederick Ford as payment in full for the Expedition.

During the interview, the defendant stated that she had recently sold the Expedition to CarMax in Laurel, Maryland and acknowledged that she deposited those proceeds into her M & T Bank account. The defendant also claimed that she had sent these proceeds to GWU. Agent Williams later interviewed the general manager of the CarMax in Laurel, Maryland, who confirmed that CarMax had purchased the Expedition from the defendant on December 4, 2004.

Records for the defendant's M & T Bank account reflect a December 6, 2004 deposit of a check from CarMax, in the amount of $22,400, dated December 4, 2004, made payable to her. However, the M & T Bank records did not reflect any checks or large withdrawals supporting the defendant's claim that she had given the proceeds from the sale of the Expedition to GWU. To the contrary, the records reflect that the defendant used the proceeds from the sale of the Expedition to pay bills and purchase personal items.

On August 14, 2006, the defendant filed a Memorandum in Aid of Sentencing and Motion for Downward Departure. See Defendant's Memorandum in Aid of Sentencing ("Def. Mem."). Citing U.S.S.G. § § 5K2.0 and 5H1.6, the defendant requested that the Court depart downward by three offense levels and sentence the defendant to probation with a component of home detention. See Def. Mem. at 10. The government opposes the defendant's motion for downward departure and respectfully requests that the Court impose a guidelines sentence of 13 months incarceration and order that the defendant make full restitution.

## II.     SENTENCING CALCULATION

    A     <u>Statutory Maxima</u>

The maximum sentence for Wire Fraud, pursuant to 18 U.S.C. §1343, is twenty years confinement. The maximum fine is $250,000.

    B.     <u>Sentencing Guidelines Calculation</u>

The PSR correctly calculates the defendant's total offense level at 13. See PSR ¶ 27. This includes the base offense level of seven pursuant to U.S.S.G. § 2B1.1(a)(1)(B) and an eight-level enhancement for "loss" of more than $70,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(E). Pursuant to the plea agreement, however, the government agreed not to oppose a two point reduction for acceptance of responsibility which yields a total offense level of 13. The PSR also has calculated correctly the defendant's criminal history as Category I. See PSR ¶ 30. Therefore, as anticipated by both parties per the plea agreement, the guideline range for the defendant is correctly calculated in the PSR as 12 to 18 months. See PSR ¶ 56. Pursuant to the terms of the plea agreement, the government and the defendant agreed that a sentence within the sentencing range determined pursuant to the United States Sentencing Guidelines would be a reasonable sentence in this case.

The PSR writer identified "Family Ties and Responsibilities" pursuant to U.S.S.G. § 5H1.6, Application Note (1)(B)(I) and (iii) as a reason the Court may wish to consider "for imposing sentence outside the otherwise applicable guideline range." See PSR ¶ 72. Specifically, the PSR writer reported that the defendant is a single mother and the primary caretaker of three young children, ages fourteen, eleven, and seven. <u>Id.</u> According to medical reports and information provided by the defendant and her father, the defendant's eleven year-

old daughter suffers from health problems, including mitral valve prolapse, reflex nephropathy, and kidney infections. See PSR ¶ 37 notes 1 - 3. The PSR writer also reported that the defendant is the sole provider of medical insurance for her eleven year-old daughter, and that the girl's father does not maintain insurance coverage on her behalf. The government notes, however, that the PSR writer specifically indicated that the inclusion of the family information "does not necessarily suggest we recommend a departure." See PSR ¶ 71.

The PSR writer also identified the defendant's lack of criminal history, her graduation from high school and completion of some college courses, her stable residence, and "no apparent need for correctional treatment" as factors the Court may wish to consider in imposing a sentence that is "sufficient but not greater than necessary." See PSR ¶ 73.

The government respectfully asserts that the factors identified by the PSR writer and proffered by the defendant are insufficient to warrant a sentence outside the guideline range. For the reasons set forth, infra §III of this Memorandum, the government respectfully recommends that the Court sentence the defendant within the guideline range calculated in the PSR.

**III.   A DOWNWARD DEPARTURE FROM THE GUIDELINES SENTENCE
         IS NOT WARRANTED IN THIS CASE.**

Despite the fact that the guideline range applicable to the defendant was calculated properly by the Pre Sentence Report writer, and despite the fact that a sentence within the guideline range would be reasonable *per se*, the defendant seeks a downward departure in order to obtain a sentence of probation. The government opposes this request and provides the following in support of its opposition.

In determining the appropriate sentence, the Court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and

7

to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Financial loss is a key factor in determining a sentence for a white-collar criminal. In fact, under the Guidelines, the amount of the victim's loss will be the single most important factor in establishing the sentence for a first-time white-collar offender charged with fraud. The government submits that even though the Guidelines now are advisory, the amount of loss still should be the most important factor in determining a fraud sentence. The sentencing scheme devised for white collar criminals in the Guidelines is sound in that the larger the loss, the greater the likelihood that even a first time offender should face a jail term. Justice is dispensed evenhandedly when white-collar criminals are required to face incarceration, just as other kinds of offenders, even first offenders, are forced to do.

In this case, the defendant concocted an intricate scheme to embezzle a significant amount of money from her employer. As an Executive Aid in GWU's Treasury Management Division, the defendant was entrusted with access to large sums of money. The defendant abused this trust by stealing in excess of $75,700 from her employer. In some cases, the monies she stole came from accounts designated for student prizes or awards or for the support of other offices within the university.

The defendant's offense conduct cannot be overlooked or minimized. Thus, the Court's sentence should contemplate not only the serious nature of the defendant's conduct, but the deterrent effect that it will have on others contemplating embezzling funds from their employers.

It is a bedrock principle in our criminal justice system that each person is responsible for her actions and, as a result, accountable for them. The defendant is no exception. Her scheme to embezzle money from her employer reveals a troubling, and all too common, motivation -- greed. The defendant sought personal gain without regard for the potential financial havoc wreaked on her employer, on the students or employees of GWU, or on her family. This chain of events demonstrates that the defendant's actions were both premeditated and calculated to enrich herself at the expense of others. The defendant should thus be sentenced within the guideline range of incarceration.

  A. <u>Specific offender characteristics do not justify a non-Guidelines sentence in this case.</u>

The defendant seeks a sentence outside the applicable guideline range, claiming that specific offender characteristics differentiate her from other defendants who would be incarcerated for similar crimes. Specifically, the defendant seeks a departure based on her "extraordinary family circumstances," arguing that she is a single parent to three daughters (ages seven, eleven, and fourteen) all of whom live with her and rely on her for support. See Def. Mem. at 2. The defendant also contends that her eleven year-old daughter is in need of "constant medical attention and is very susceptible to infections." <u>Id</u>., at 3. The government asserts that the evidence does not support the defendant's assertion that her family circumstances qualify as "extraordinary." A departure from the guidelines sentence is not warranted in this case.

When the Sentencing Commission evaluated the importance of most specific offender characteristics, it found them not ordinarily relevant to a sentence outside the guideline range. See generally § 5H1.1 <u>et</u> <u>seq</u>. This determination is not surprising. Although every defendant who stands before a judge for sentencing possesses unique offender characteristics, there is no

9

consensus among judges or other experts about how to evaluate the normal idiosyncracies of each individual's life.  Moreover, very little deference should be accorded defendants who seek a reduced sentence because of family ties.

> Congress has directed the Sentencing Commission to 'assure that the guidelines and policy statements ... reflect the general inappropriateness of considering the ... family ties and responsibilities ... of the defendant.  28 U.S.C. § 994(e).  Pursuant to this statutory mandate, the Commission has provided that "[f]amily ties and responsibilities ... are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.  U.S.S.G. § 5H1.6 p.s.

United States v. Dyce, 91 F.3d 1462, 1466 (D.C. Cir. 1996).

Although the decision of the Court of Appeals which reversed the departure in Dyce is no longer binding because the Guidelines are advisory, the analysis of the decision remains instructive.   In particular, the Court said

> At the risk of stating the obvious, we note that the "extraordinary" can be defined only in relation to the "ordinary;" and at the risk of belaboring the obvious, we add that ordinary family responsibilities can be very great.

Id.  In that regard, the claim of family responsibility is a two-edged sword.  Because she is supposed to provide for her family, the defendant should have been especially careful to avoid criminal behavior that could jeopardize the family relationship.  Instead, the defendant stole in excess of $75,700 from her employer and used the funds to pay for items for *herself*.  With the funds she embezzled, the defendant purchased airline tickets for travel to Seattle, Washington for *herself* and three friends.  She also paid $3,700 for a plastic surgery procedure for *herself*, and purchased a laptop, college tuition, a P.D.A., and various personal items and services with her GWU credit card.  Remarkably, the defendant purchased a brand new, high-end vehicle for

$37,493.69 with the stolen funds.  None of these purchases related to the defendant's care of her three minor children or to her eleven year-old daughter's medical expenses.

In her memorandum in aid of sentencing, the defendant asserts that she "dedicates almost all of her free time to taking care of her ill daughter." Id.  The defendant also claims that her children's fathers are not suitable caretakers for the children.  Id.  It is difficult to assess the defendant's claims in this regard, since there is no information from the fathers themselves in the PSR report.  However, the defendant admits that the father of her seven year-old pays shares joint custody with the defendant, pays regular child support, and visits his daughter every other weekend.  Id.  The father of the eleven year-old and fourteen year-old pays child support irregularly and sometimes visits with his youngest daughter.  Id.  Notably, the defendant has never taken this man to court for child support for her fourteen year-old and eleven year-old children.  Also, although the defendant's own father contends that her incarceration would result in "hardship for all involved" (see PSR ¶ 39), he is apparently supportive of the defendant and her children.

Although the defendant contends that her eleven year-old daughter is reliant upon her for medical insurance, there is no guarantee that the defendant will retain her job after her conviction.  According to the PSR writer, the defendant has not informed her current employer of her status with respect to this case.  See PSR ¶ 47.  Although the U.S. Probation Office honored the defendant's request that they not contact her employer, the PSR writer points out that they have been unable to assess a third party risk the defendant's position may cause her employer.  See PSR ¶ 48.  The government submits that such an assessment is necessary, and respectfully requests that the Court require the probation office to contact the defendant's

employer to ensure that the defendant does not occupy a position in which she poses a danger to the well-being of her employer or other employees. Regardless, as a minor suffering from a health condition, the defendant's eleven year-old child would certainly be eligible for health care insurance under the Medicaid program.

It is the defendant's own conduct in this case that belies the notion that she is indispensable to the care of her eleven year-old daughter. As part of her scheme to defraud GWU, the defendant purchased airline tickets for a cross-country trip with three friends to Seattle, Washington. Apparently, her concern for her daughter's health-related issues did not factor into her decision to make this pleasure trip. In addition, with the exception of brief hiatuses necessitated by job transitions, the defendant has been employed full-time at different jobs from June 2003 through the present. Presumably during this time, someone else has been taking care of the defendant's children during the eight-hour work days. Thus, the defendant's assertion that her incarceration would result in no one being available to ensure her daughter's medical care, rings hollow.

Although she is trying to invoke the Court's sympathy for the impact which incarceration will have upon her family, the defendant is ignoring the inescapable truth that it is entirely her own behavior which has brought her before the Court for sentencing. As the Court of Appeals sadly has noted:

> The unfortunate fact is that some mothers are criminals; and, like it or not, incarceration is our criminal justice system's principal method of punishment.

Dyce, id. at 1468.

The defendant could have – and should have – considered the consequences to her family

before engaging in the elaborate fraud committed against GWU. Moreover, the defendant has failed to present compelling offender characteristics to distinguish her from other defendants with no criminal history who have engaged in similar schemes to defraud their employers of in excess of $70,000.

      B. <u>The Court should also consider that the defendant was not forthcoming with the PSR writer</u>.

The PSR writer reported that when she questioned the defendant about the circumstances of her leaving her job at Southern Maryland Hospital in February 2005, the defendant told the PSR writer that the position had been "temporary" and she had "left when the position closed." PSR at ¶ 49. When the PSR writer called the defendant's former employer at Southern Maryland Hospital to confirm the reason for the defendant's departure, the Human Resources Director informed her that the defendant had been terminated for cause. More specifically, the Human Resources Director reported that the defendant's termination notice indicated that the defendant was a "disgruntled employee and was not to be rehired due to attitude." PSR ¶ 49. According to the Human Resources Director, the defendant's supervisor reported that the defendant had made threatening comments to her.

After receiving the defendant's objections to the inclusion of this information in the PSR report, the PSR writer once again contacted the Human Resources Director at Southern Maryland Hospital. The Director reiterated the information he had originally provided regarding the defendant's termination for cause. The government also notes that during the investigation of this case, FBI agents learned that representatives of Southern Maryland Hospital had terminated the defendant prior to the end of her probationary period due to concerns relating to her work and demeanor.

The defendant's pattern of dishonesty in this case is troubling. Obviously, the defendant exhibited dishonesty in her scheme to embezzle funds from her employer. In addition, although the defendant admitted a large portion of her criminal conduct when speaking with FBI agents on December 23, 2004, she was not completely truthful with them.[1] During her interview with the agents, the defendant stated that she had sold the Expedition she had purchased with the embezzled funds the week before and had returned the remaining funds to GWU via cashier's check. Follow-up investigation revealed that the defendant sold the Expedition to Car Max earlier than she had reported to the agents and that she had not purchased a cashier's check or returned the money to GWU. Instead, this money remained in her bank account until it was seized by FBI agents. Finally, the defendant continued her pattern of dishonesty with the PSR writer by falsely reporting the circumstances of her termination from Southern Maryland Hospital.

### IV.    A SENTENCE OUTSIDE THE GUIDELINE RANGE IS NOT COMPELLED BY BOOKER OR BY THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

Although the government recognizes that under United States v. Booker, 125 S. Ct. 738 (2005) and 18 U.S.C. § 3553(a), the Court is free to impose a sentence outside the guideline range in this case, for all of the reasons articulated above, the government respectfully requests that the Court not do so.

---

[1] Contrary to the defendant's contention in her sentencing memorandum, she did not provide a "full confession" to FBI agents on December 23, 2004. During her interview with the agents, the defendant did not recall creating and endorsing a check for $6,600 and a check for $2,600, even though she later admitted to creating and endorsing these checks as part of the plea colloquy in this case. Further, the defendant told agents that she had been issued a cellular telephone by GWU, but agents later learned from the defendant's supervisor that this was not correct.

In Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 125 S. Ct. at 756. Although the Court struck down the provision that made the Guidelines mandatory, it expressly refused to invalidate the Guidelines in their entirety.

In the wake of Booker, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 767. The position of the United States is that, absent highly unusual circumstances, the sentence in a criminal case should fall within the guideline range as determined by the Court. This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in Booker recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history.

Moreover, the Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the

15

offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; © ) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ."

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the Congressional purpose, affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible.  The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate.

In this case, for all of the reasons articulated above, the government contends that the personal and family circumstances of the defendant are not sufficiently unusual or compelling to warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the guideline range calculated in the PSR.

**IV.    RESTITUTION**

The victim has documented a loss of $75,748.43.  The FBI recovered $17,337.75 of these losses for the victim by seizing this amount from the defendant's bank account in December 2004.  Pursuant to an administrative forfeiture proceeding, the $17,337.75 was returned to the victim.  Thus, the remaining amount of restitution owed to the victim by the defendant is

$58,410.68.[2]  As the PSR states, the Court shall order full restitution to the victims without consideration of the economic circumstances of the defendant.  See PSR ¶ 69, citing 18 U.S.C. § 3664(f)(1)(A).  As such, the government requests that the Court order the defendant to pay restitution in the amount of $58,410.68 to George Washington University.

## V.    CONCLUSION

The facts of this case are all too typical of the kind of cases that are prosecuted under 18 U.S.C. § 1343 - crimes motivated by greed.  Furthermore, the defendant has failed to demonstrate the existence of extraordinary family circumstances that would suggest the appropriateness of a downward departure in this case.  Accordingly, the government respectfully requests that the Court sentence the defendant to a guidelines sentence of thirteen months incarceration and further order the defendant to pay full restitution at the conclusion of any term of incarceration.

                                          Respectfully submitted,

                                          KENNETH L. WAINSTEIN
                                          UNITED STATES ATTORNEY

                                          _____
                                          KIM A. HERD
                                          Assistant United States Attorney
                                          Room 10-840
                                          555 4th Street, N.W.
                                          Washington, D.C. 20530
                                          (202) 616-9370

---

[2] Although the amount of loss submitted to the PSR writer by a representative of the victim was $58,427.04 (a difference of $16.36 from the restitution amount of $58,410.68 agreed to by the government and the defendant in the plea agreement), the victim has agreed that based on the small discrepancy, it has no issue with the original restitution amount contemplated in the plea agreement.  See PSR ¶ 14.

CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that a copy of the foregoing Government's Memorandum in Aid of Sentencing and Opposition to the Defendant's Motion for Downward Departure has been served electronically upon Jonathan Jeffress, Esq., counsel for the defendant, this 22nd day of August, 2006.

                                                              _____
                                                              KIM A. HERD
                                                              ASSISTANT U.S. ATTORNEY